(Nos. 47944, 47947 cons.—■■■■■■■■■■)
LEONARD FUCHS *et al.,* Appellees, v. ARTHUR J. BID-WILL *et al.,* Appellants.

*Opinion filed Dec. 3, 1976.—Rehearing denied Jan. 28, 1977.*

504

SCHAEFER, KLUCZYNSKI and CREBS, JJ., dissenting.

Edward F. Casey, of Casey & Casey, of Springfield, for appellants Arthur J. Bidwill, A. L. Cronin, and Clyde Lee.

R. G. Heckenkamp, of Heckenkamp and Fuiten, of Springfield, for appellants Clyde W. Choate, John W. Lewis, Jr., and William J. Murphy.

Kenneth E. Critser, of Kritzer, Stansell & Critser, of Monmouth, for appellant Robert T. McLoskey.

William T. Panichi, Jack E. Walker, and John E. Bookwalter, of Springfield, for appellants Barbara Peters, Executor of the Estate of Everett R. Peters, and Lillian H. Pollack.

Alexander Polikoff, Robert J. Vollen, and Thomas Londrigan, of Chicago, for appellees.

William J. Scott, Attorney General, of Springfield (Samuel W. Witwer, Special Assistant Attorney General, of counsel), for *amicus curiae* the People.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiffs, Leonard Fuchs and Businessmen for the Public Interest, appealed from the judgment of the circuit court of Sangamon County entered in favor of the defendants upon allowance of their motions to dismiss. The appellate court reversed the judgment and remanded the cause for further proceedings (31 Ill. App. 3d 567), and we allowed defendants' petitions for leave to appeal.

Plaintiffs, "as representatives of and on behalf of all citizens, residents and taxpayers of the State of Illinois" filed a complaint in two counts, seeking an accounting, the declaration of a constructive trust and other equitable relief. They alleged that plaintiff Fuchs "is, and has been, a citizen, resident and taxpayer of the State of Illinois" and that "plaintiff Businessmen for the Public Interest, Inc., is an Illinois not-for-profit corporation concerned with the prevention of corruption and self-dealing in public office. Since its inception Businessmen for the Public Interest has acted as a public benefit corporation by asserting the interest of the public in preventing official misconduct."

In count I, pleaded in 27 paragraphs, plaintiffs alleged that Marjorie Lindheimer Everett (hereafter Everett) oper-

ated Arlington Park and Washington Park racetracks; that in 1961 she organized Washington Park Trotting Association, Inc. (hereafter Washington Park); that during the years 1962-1968 Washington Park was awarded "prime racing dates" and "earned large profits"; that immediately after Washington Park was organized Everett began "making shares of stock \*\*\* available" to defendants, "who were members and leaders of the Illinois General Assembly during the 72nd and 73rd sessions of the General Assembly held during 1961-1964"; that "During these years, each defendant purchased Association [Washington Park] shares at the price of $1 per share"; that "Thereafter, during 1965-1967, Everett afforded defendants the opportunity to have such Association shares repurchased, and each defendant sold all or substantially all his Association shares at prices ranging from $3 to $7 per share." It was alleged that the defendants made profits on the stock ranging from $6,000 to $294,000.

It was further alleged that the transactions "were carried out secretly in order to conceal the fact that defendants had ownership interests" in Washington Park and that "each profited greatly from the sale of those interests." Stating that "In view of the secrecy" the allegations were made on information and belief it alleged the approximate dates on which "Everett afforded" each defendant "the opportunity to purchase," the approximate dates on which "Everett afforded" each defendant "the opportunity to sell" the shares alleged to have been so bought and sold, the number of shares involved and the approximate profit realized from the transaction. The complaint set forth the office occupied by each individual defendant and alleged that:

"22. By virtue of their public offices, defendants, individually and collectively, had power and influence with respect to the passage by the General Assembly of legislation directly affecting the operations and profitability of thoroughbred and harness racing in Illinois. \*\*\*

23. Everett made Association shares available to

each defendant, individually and collectively, because the public office each held enabled him to exercise power and influence over horse racing in the State of Illinois, and Everett expected that by making such shares available to the defendants, individually and collectively, her racing businesses would profit from such power and influence. At the times Association shares were made available to and acquired by him, each defendant knew of Everett's reason for making Association shares available to him and knew of Everett's expectation of profit. At such times each defendant also knew that Association shares had been or would be made available by Everett to the other defendants. At such times Association shares were not generally made available by Everett to persons not holding positions of power and influence in the General Assembly of the State of Illinois.

24. By acquiring, owning and selling Association shares under the circumstances alleged above, each defendant violated his fiduciary duty to the people of the State of Illinois, including his obligation to utilize the power and influence of his public office solely in the best interests of the people of the State of Illinois and not for private gain.

25. By reason of such violations by each defendant of his fiduciary duty, each defendant holds all Association shares which he now owns and all proceeds, including dividends and gains from sale, received with respect to Association shares which he has owned at any time, as an involuntary and constructive trustee for the benefit of the people of the State of Illinois."

Plaintiffs prayed that:

"I

Each defendant be declared a constructive trustee for the benefit of the people of the State of Illinois (a) of any Association shares which he now owns, directly or indirectly, and (b) of all proceeds received by him, directly or indirectly, at any time with respect to Association shares which he now owns or has owned, directly or indirectly, including, without limitation, all proceeds received upon the sale of said shares.

II

Each defendant be required to account for all Association shares owned by him at any time, and for all

proceeds received and profits realized in connection with the ownership and sale of such shares, and that an appropriate judgment based on that accounting be entered against each defendant in favor of the people of the State of Illinois."

In count II plaintiffs repeated and realleged the allegations of count I and that:

"24. By acquiring, owning and selling Association shares under the circumstances alleged above, each defendant violated the standard of conduct mandated by Ill. Rev. Stat., ch. 38, sec. 33—1(d).

25. By reason of such violations by each defendant of his statutory duty, each defendant holds all Association shares which he now owns, and all proceeds, including dividends and gains from sale, received with respect to Association shares, which he has owned at any time, as an involuntary and constructive trustee for the benefit of the people of the State of Illinois."

It was also alleged that written demand was made on the Attorney General that "he bring suit against defendants by reason of the matters herein above alleged" and that he declined to do so.

The circuit court holding "that plaintiffs have no standing to file this action and that the complaint filed herein is insufficient as a matter of law" dismissed the suit. The appellate court, holding that both plaintiffs had standing to sue and that "Since the rule defining the responsibilities of public officials is not based upon harm necessarily done but upon equitable principles of preventing a conflict of opposing interests in the minds of officials, there is little persuasive weight in the contention that the complaint fails to allege facts which disclose that defendants did anything which was contrary to the public interest, that there are, or were, wrongful acts, or which disclose an exercise of power or influence to aid Everett" (31 Ill. App. 3d 567, 573), found the complaint sufficient, reversed the judgment and remanded the cause to the circuit court.

Defendants, arguing that permitting plaintiffs to bring

this action "is an unconstitutional usurpation of the power of the Attorney General of the State of Illinois," contend that the circuit court correctly decided the question of standing and that in reversing the judgment the appellate court erred. We allowed the Attorney General's motion for leave to file an *amicus curiae* brief in which it is argued that plaintiffs have standing to bring this action. The brief neither disputes plaintiffs' assertion that the Attorney General declined to bring the action nor states his reasons for so doing.

Common to all the authorities cited by the parties and *amicus* (see *Fergus v. Russel,* 270 Ill. 304; *People v. Holton,* 287 Ill. 225; *Jones v. O'Connell,* 266 Ill. 443; *Saxby v. Sonnemann,* 318 Ill. 600; *Droste v. Kerner,* 34 Ill. 2d 495; *Paepcke v. Public Building Com.,* 46 Ill. 2d 330; *Koehler v. A Centry of Progress,* 354 Ill. 347; *Carstens v. City of Wood River,* 344 Ill. 319; *McCormick v. Chicago Yacht Club,* 331 Ill. 514) is the fact that the funds alleged to be misappropriated, misapplied or wrongfully retained were unquestionably public funds, and in those cases which involved real estate, the lands were unquestionably public property. In the cases cited by plaintiffs in which an equitable accounting was ordered or a constructive trust imposed, the action was brought by the political entity whose property or money was involved (see *City of Boston v. Santosuosso* (1940), 307 Mass. 302, 30 N.E.2d 278; *City of Boston v. Dolan* (1937), 298 Mass. 346, 10 N.E.2d 275; *Driscoll v. Burlington-Bristol Bridge Co.* (1952), 8 N.J. 433, 86 A.2d 201; *City of Jersey City v. Hague* (1955), 18 N.J. 584, 115 A.2d 8; *State v. McKelvey* (Ohio 1967), 12 Ohio St. 2d 92, 232 N.E.2d 391; *Williams v. State* (1957), 83 Ariz. 34, 315 P.2d 981), and the parties have not cited, nor have we found, any case in which a taxpayer was held to have standing to bring the action where the funds or lands would become public property only upon the imposition of a constructive trust.

Although the conduct alleged in the complaint is

deplorable, and conduct of this character unquestionably induced the enactment of the regulatory legislation presently in force and effect, the public interest will not be served in permitting persons, without limitation, to institute actions of this nature against public officials when the Attorney General has declined to act.

The powers and duties of the Attorney General are set forth in article V, section 15, of the 1970 Constitution and in "An Act in regard to attorneys general and state's attorneys" (Ill. Rev. Stat. 1975, ch. 14, par. 4), and this court has held that he is the only officer empowered to represent the State in litigation in which it is the real party in interest (*People ex rel. Scott v. Briceland,* 65 Ill. 2d 485; *Fergus v. Russel,* 270 Ill. 304). It is presumed that a public official "performs the functions of his office according to law and that he does his duty." (*People v. Newcomer,* 284 Ill. 315, 324.) It may therefore be presumed that the Attorney General will act to enforce the statutes regulating lobbying (Ill. Rev. Stat. 1975, ch. 63, par. 171 *et seq.*), which were first enacted in 1957, and the comprehensive statutory scheme recently enacted which regulates campaign contributions (Ill. Rev. Stat. 1975, ch. 46, par. 9—1 *et seq.*), the disclosure of economic interests of legislators and other public officials and their ethics and code of conduct (Ill. Rev. Stat. 1975, ch. 127, par. 601—101 *et seq.*), and when appropriate, seek an accounting or the imposition of a constructive trust. The possibility that the Attorney General may not act in a given case when he should do so does not justify granting standing to anyone who desires to bring an action. We hold therefore that plaintiffs were without standing to bring this action.

In view of the conclusion reached concerning the plaintiffs' lack of standing to bring the action we do not consider the other contentions made by the parties. The judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. JUSTICE SCHAEFER, with whom MR. JUS-
TICE KLUCZYNSKI and MR. JUSTICE CREBS join,
dissenting:

Mr. Justice Kluczynski, Mr. Justice Crebs and I are of
the opinion that the judgment of the appellate court
should be affirmed.

The majority apparently reverses that judgment be-
cause it feels that "the public interest will not be served in
permitting persons, without limitation, to institute actions
of this nature against public officials when the Attorney
General has declined to act." By this means the majority
has avoided the necessity of determining the legality of the
conduct of the defendants and their right to retain the
profits they realized by that conduct. If the plaintiff
taxpayer is correct in his legal theory, and can prove the
facts alleged, the State of Illinois would recover a sum well
in excess of $300,000. The facts alleged are admitted by
the defendants' motions to dismiss, and in our opinion the
public interest clearly requires that the merits of this claim
be decided. Instead, the majority avoids that important
decision by giving the Attorney General the exclusive right
to bring this action—a right which he has not claimed and
does not want.

What was said in *Paepcke v. Public Building Com.*
(1970), 46 Ill. 2d 330, 341, is pertinent here:

> "In *Droste v. Kerner,* 34 Ill. 2d 495, 504, this
> court held that an individual taxpayer or property
> owner, in the absence of statutory authority
> conferring that right, had no standing in equity to
> enjoin an alleged misuse of property held in trust
> for the public unless he alleges and proves that he
> will suffer special damage, different in degree and
> kind from that suffered by the public at large.
> There was a dissent in the *Droste* case in which it
> was pointed out that the alleged cause of action
> in such cases is based upon the individual's status
> as a taxpayer and that it is his equitable interest,
> as a taxpayer, in the public property which he

claims. is being illegally disposed of that determines his standing to maintain the action; that his right to sue does not depend on any injury to his property and that he should not be forced to rely solely upon the efforts of public law officers for the protection of public rights. Authorities were cited to support this position and distinctions were observed as to the authorities relied upon by the majority. Upon serious reconsideration of this question we now believe that portion of the opinion in *Droste* dealing with the right and standing of the plaintiff to sue should be overruled, as should any other former decisions of this court holding that a citizen and taxpayer has no right, in the absence of statute, to bring an action to enforce the trust upon which public property is held unless he is able to allege and prove special damage to his property. If the 'public trust' doctrine is to have any meaning or vitality at all, the members of the public, at least taxpayers who are the beneficiaries of that trust, must have the right and standing to enforce it. To tell them that they must wait upon governmental action is often an effectual denial of the right for all time."

The majority acknowledges that a host of decisions support the proposition that a taxpayer has standing to maintain an action to recover public funds (or public lands) that are alleged to have been "misappropriated, misapplied or wrongfully retained." But it seems to say that the title to the funds or property in question must be undisputed if the action is to be maintained. That has never before, so far as we are aware, been held to be an essential prerequisite to such an action, and no reason or authority is stated to support the imposition of such a requirement.

The defendants argue that a legislator is not a fiduciary. They say:

"The cases cited by the Appellate Court in its opinion, *U. S. v. Drumm,* 329 F.2d 109; *Williams v. State,* 85 Ariz. 34; *Jersey City v. Hague,* 18 N.J. 584; and *U. S. v. Carter,* 217 U.S. 286, all involved government employees or executive officers, and not Legislators."

We reject this proposition, which amounts to an assertion that legislators may retain amounts paid to them as bribes, while "government employees and executive officers" can not.

That the value of the stock sold to the defendants was not alleged to be any greater than the one dollar per share which they paid, and that no agreement by Everett to repurchase was alleged, are irrelevant. The complaint alleges that the defendants had power and influence with respect to the passage of legislation directly affecting the operations and profitability of thoroughbred and harness racing in Illinois because both kinds of racing were licensed, regulated, and taxed by statutes, the provisions of which are summarized in the complaint. By acquiring the stock with the knowledge that Mrs. Everett made it available to them so that her racing businesses would profit from their power and influence, the defendants put themselves in a position where they could, by their legislative action—or inaction—enhance the value of their stock. The complaint alleges that the stock was repurchased in a very short time at prices that yielded the defendants extraordinary profits. And of course a fiduciary is liable for the income and gain on property he acquires in breach of his duty. (See Restatement of Agency (Second) sec. 407 (1958).) A public officer is not to be held to a lower standard of morality than a private citizen.

The fact that the complaint does not allege that the defendants' "failure to disclose" violated any statute or other duty is immaterial. It didn't have to make such an allegation, although it may have been thought desirable to meet an anticipated defense of laches. In any event it is certainly a reasonable inference that if the defendants'

financial stake in the racing enterprises was known, their power and influence in the State legislature would have been eliminated. Secrecy was essential to the success of the plan.

One of the commonest forms of corruption is payment for "protection." It involves law enforcement officers, but it does not involve payment for any action taken by them. It probably arises most frequently in connection with gambling and prostitution, and the protection payments are made for inaction as well as for action. To put the problem of the present case in a somewhat different context, the judges of a reviewing court, who buy a security not generally available, but which is offered to them with the expectation, made known to them, that they will use the power and influence of their offices to the offerors' advantage, certainly could not retain their profit. This would be true even though no case involving the offeror came before them for decision. And of course the case with respect to these defendants is quite different, for there was actually legislation pending during all of the sessions referred to in the complaint, and even if there were not, these defendants had the power to initiate legislation—a power which judges do not have.

In *United States v. Isaacs* (7th Cir. 1974), 493 F.2d 1124, *cert. denied,* 417 U.S. 976, 41 L. Ed. 2d 1146, 94 S. Ct. 3183, the Federal criminal case against Theodore Isaacs and Otto Kerner, which also involved the distribution by Mrs. Everett of stock in her racing enterprises, the Seventh Circuit was confronted with the contention that the Illinois bribery statute (Ill. Rev. Stat. 1973, ch. 38, par. 33—1) required that some particular act be charged. The court rejected that claim, stating:

> "Subsection 33—1(d) provides that bribery occurs when property is accepted by a public official with knowledge that it is offered with intent to influence the performance of any act related to his public position. No particular act need be

contemplated by the offeror or offeree. There is bribery if the offer is made with intent that the offeree act favorably to the offeror when necessary." (493 F.2d at 1145.)

In *Commonwealth v. Lapham* (1892), 156 Mass. 480, 484, 31 N.E. 638, 639, the Supreme Judicial Court said regarding a similar contention made in an appeal from a bribery conviction:

"Nor is it necessary in an indictment under the above mentioned section of the statute to aver that the corrupt intention to influence the act, opinion, decision or judgment of the inspector was in relation to any specific and particular matter then pending before him, or which was then expected to come before him. It is enough to aver a corrupt intention so to influence him in any matter which may then be pending, or which may by law come or be brought before him. If for example an executive, legislative or judicial officer is bribed corruptly to favor a particular person in any and all matters affecting that person which may come before such officer, without specification or knowledge of the particular matters likely to come up, the statute is broad enough to include such a case. A narrower construction of a similar statute has been adopted in Alabama, but we cannot follow it. *Barefield v. State,* 14 Ala. 603."

In our view it would be anomalous to hold that if Mrs. Everett had concluded a bargain with the defendants on a retail basis, whereby they would support or oppose a specific bill affecting racing (*e.g.,* a bill changing the amount of a tax on racing), an action for restitution would lie, but that if she bargained with defendants, as she did here on a wholesale basis, to secure their general favor on whatever matter might come up affecting her racing interests or racing interests in general, it would not.

It has been suggested that what happened here resembles the giving of campaign contributions, and from this resemblance the conclusion is drawn that the defendants in this case should be permitted to retain their profits. We do not agree.

The present case does not involve campaign contributions, and the conduct alleged in the complaint is not justified by the fact that campaign contributions are sometimes subject to abuse. Political contributions are tolerated because it is felt that without them only the wealthy could afford to be candidates for public office, not because they are inherently desirable. Such contributions are difficult to control and are obviously subject to abuse. The answer to thoses abuses lies in more effective control of contributions, and not in the lowering of standards which govern the conduct of public officers to the lowest possible common denominator. Efforts to bring them under control are being made both nationally and in the States by requirements of disclosure and accounting, as well as by limitations on amounts and by financing through tax deductions.